# In the United States Court of Federal Claims

No. 11-294C

(Filed Under Seal: May 27, 2011)

Reissued: June 13, 2011[1]

_____

| | |
|---|---|
| NETSTAR-1 GOVERNMENT CONSULTING, INC., | * * * |
| Plaintiff, | * * |
| v. | * Post-award bid protest; Motion for preliminary injunction; Organizational conflicts of interest; Likelihood of success on the merits; Organizational conflicts of interest – unequal access; Identification of conflicts and mitigation efforts; Irreparable harm; Balance of hardships; Public interests; Preliminary injunction granted. |
| THE UNITED STATES, | * |
| Defendant, | * |
| and | * |
| ALON, INC., | * |
| Defendant-Intervenor. | * * * |

_____

**OPINION AND ORDER**
_____

*John J. O'Brien*, Cohen Mohr, LLP, Washington, D.C., for plaintiff.

*Daniel B. Volk*, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Tony West*, for defendant.

*Douglas L. Patin*, Bradley, Arant, Boult, Cummings, LLP, Washington, D.C., for defendant-intervenor.

---

[1] An unredacted version of this opinion and order was issued under seal on May 27, 2011. The opinion and order issued today incorporates the parties' only proposed redaction and corrects some minor typographical errors. The redacted material is represented by brackets [ ].

**ALLEGRA, Judge:**

Before the court, in this bid protest action, is plaintiff's motion for a preliminary injunction. For the reasons that follow, the court **GRANTS** this motion.

**I.    BACKGROUND**[2]

In this post-award bid protest, NetStar-1 Government Consulting, Inc. (NetStar-1) challenges the award by the Department of Homeland Security, United States Immigration and Customs Enforcement (ICE), of a blanket purchase agreement (BPA) to ALON, Inc. (ALON) to provide program management support services for the ICE Office of the Chief Information Officer (OCIO). The contract has an estimated value of []. NetStar-1 alleges that the BPA was inappropriately awarded to ALON despite the existence of an unmitigated organizational conflict of interest. NetStar-1, which was the incumbent on a prior related contract, is currently providing the services in question under a bridge contract that is set to expire June 28, 2011. ALON is to begin transitioning into the new contract on or about May 28, 2011.

On May 11, 2011, NetStar-1 filed its complaint in this court along with, *inter alia*, an application for a temporary restraining order and a motion for a preliminary injunction. On May 12, 2011, ALON filed a motion to intervene as defendant-intervenor, which the court granted on May 13, 2011. On that same day, the court also held a status conference with the parties, during which the parties agreed to forgo resolution of the application for a temporary restraining order in favor of an accelerated briefing schedule on the motion for preliminary injunction. On May 26, 2011, the court heard argument on the motion for preliminary injunction (during the recess of a trial currently being conducted by the undersigned in Boston, Massachusetts).

**II.   DISCUSSION**

In order to obtain a preliminary injunction, a plaintiff must establish four factors: "'[1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest.'" *Am. Signature, Inc. v. United States*, 598 F.3d 816, 823 (Fed. Cir. 2010) (quoting *Winter v. NRDC*, 129 S. Ct. 365, 374 (2008)). "No one factor is dispositive to the court's inquiry as 'the weakness of the showing regarding one factor may be overborne by the strength of the others.'" *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 373 (2010) (quoting *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993)). However, the first two factors are the most critical, and "a movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction." *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009). "[B]ecause injunctive relief is

---

[2] Owing to the urgent need of the parties for a ruling in this matter, the court's recitation of the facts and law is necessarily brief.

relatively drastic in nature, a plaintiff must demonstrate that its right to such relief is clear." *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 709 (2006).

      **A.**     **Likelihood of Success**

Initially, the court must determine whether it is likely that the court will overturn the award decision as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  28 U.S.C. § 1491(b)(4).  The court may overturn a procurement decision where "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *see also Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009).  NetStar-1 contends that the award in question was flawed by the existence of an unmitigated organizational conflict of interest that stems from ALON's access to information gained from its performance of other ICE contracts.  Among the latter contracts was one in which ALON provided budget support to the OCIO, under which certain ALON employees developed and had access to databases of proprietary information that included the labor categories, job categories, and fully-loaded labor rates for NetStar-1's employees working on ICE contracts.  Under its contracts with the OCIO, ALON's employees also had access to the OCIO's budget execution plan and various other non-public information concerning OCIO procurements.

The Federal Acquisition Regulations (FAR) tasks contracting officers with the responsibility to "analyze planned acquisitions in order to (1) [i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible; and (2) [a]void, neutralize, or mitigate significant potential conflicts before contract award."  48 C.F.R. § 9.504(a).  Among the organizational conflicts of interest identified by the FAR are those involving unequal access to information, which arise when the contractor has access to "[s]ource selection information . . . that is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract."  *Id*. at § 9.505-4; *see also Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 569 (2010).  As the FAR provision quoted above suggests, a contracting officer, in certain circumstances, may avoid, neutralize, or mitigate the impact of an organizational conflict of interest, allowing a procurement to proceed.  Under the FAR, "the identification of organizational conflicts of interest and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion."  *PAI Corp. v. United States*, 614 F.3d 1347, 1351-52 (Fed. Cir. 2010).

         **1.**     **Organizational Conflicts of Interest – Unequal Access**

There are hard facts here that strongly suggest the existence of several organizational conflicts of interest associated with ALON having had unequal access to information that could have provided it with a significant competitive advantage in obtaining the BPA.  *See ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 202 (2007).  Defendant's arguments to the contrary – centering on its contention that there was no "unequal" access because both ALON and NetStar-1 had access to latter's proprietary information – border on the frivolous.  Moreover, there is little doubt that ALON stood to gain a competitive advantage if it used proprietary

- 3 -

information regarding, *inter alia*, its competitor's labor rates in crafting its own bid.  Indeed, the administrative record reveals that ALON was awarded the contract in question under a best-value, technical-cost trade-off decision, based on its having a lower price than that offered by NetStar-1.  *See* 48 C.F.R. § 15.101-1.

### 2.     Identification and Mitigation Efforts

Based on its preliminary consideration of the merits, the court has serious questions regarding the timing and adequacy of the agency's mitigation efforts.  It appears, at this moment, that the contracting officer did not ascertain the existence of the conflicts of interest on a timely basis so as to permit effective and timely mitigation.  FAR § 9.504(a) requires the contracting officer to identify and evaluate potential conflicts "as early in the acquisition process as possible" and to mitigate "significant potential" conflicts before a contract award.[3]  Here, there is evidence that the contracting officer did neither of these things.  In particular, she failed, prior to the award, to identify (or at least consider) that ALON was performing services for the OCIO that plainly raised serious questions regarding its participation in other procurements by that same office.  This failure occurred even though these other contracts explicitly warned that ALON's performance thereunder would cause future organizational conflicts of interests providing that company with a competitive advantage.  And, even more remarkably, it occurred even though the contracting officer here was also the contracting officer on at least two of the ALON contracts alleged to give rise to the subject conflicts.  Under these circumstances, it does not seem adequate for the contracting officer to have relied, as she did, upon the offerors to self-identify any organizational conflicts of interest they thought existed – a conclusion that finds support in the relevant FAR provisions and the cases construing them.[4]

---

[3]   Defendant admits that had ALON used the proprietary information to which it had access to obtain the contract in question that would be a "significant" conflict of interest.

[4]   *See* 48 C.F.R. § 9-506(a) ("If information concerning prospective contractors is necessary to identify and evaluate potential organizational conflicts of interest . . . , contracting officers should first seek the information from within the Government . . . . Government sources include the files and the knowledge of personnel within the contracting office, . . ."); *see also The Analysis Group, LLC*, 2009 CPD ¶ 237 at 4 (2009) ("agencies must give consideration not only to information that may have been furnished by a firm, but also must consider, as appropriate, the scope of products manufactured or services provided by the firm . . . an agency may not, in effect, delegate to the contractor itself complete responsibility for identifying potential OCIs"); *L-3 Servs. Inc.*, 2009 CPD ¶ 171 (2009) ("An agency's reliance on a contractor's self-assessment of whether an organizational conflict of interest exists . . . is inconsistent with the FAR."); *Johnson Controls World Servs., Inc.*, 2001 CPD ¶ 20 at 6 (2001) ("[T]he [agency] proceeded as if the clause were self-executing . . . beyond compliance with the FAR, the agency's approach of essentially leaving the determination of the existence, as well as the mitigation, of a potential conflict solely to the contractor – who is not in a position to make an objective judgment – simply is not a reasonable means of avoiding or mitigating an OCI.").

One reason why ALON's organizational conflicts of interest may have been overlooked is because the contracting officials for the OCIO failed to comply with FAR § 9.505-4(b). That provision indicates that "[a] contractor that gains access to proprietary information of other companies in performing advisory and assistance services for the Government must agree with the other companies to protect their information from unauthorized use or disclosure for as long as it remains proprietary and refrain from using the information for any purpose other than that for which it was furnished." *Id*. It adds that: "[t]he contracting officer shall obtain copies of these agreements and ensure that they are properly executed." *See also* 48 C.F.R. § 9.508(h) (illustrating the proper application of this provision). Defendant admits that these provisions were not followed by the agency here.

In addition, there is indication that the approach taken by the contracting officer to mitigate the conflicts of interest was arbitrary and capricious or otherwise contrary to law. The mitigation plan adopted by the contracting officer has some interesting features. As part of the plan, the contracting officer obtained declarations from ALON employees working at OCIO who indicated that they had not obtained NetStar-1's proprietary information or shared such information with other ALON officials. But, the individuals from whom these declarations were obtained proved not to be the right personnel; declarations from the dozen ALON employees who actually had access to the relevant databases containing NetStar-1's proprietary information were never obtained (and thus not considered by the contracting officer). As part of the mitigation plan, the contracting officer also obtained copies of Department of Homeland Security non-disclosure agreements signed by ALON employees. But, all but one these agreements were not dated, leaving open questions as to when they were signed. And none of them were approved by the companies whose proprietary information was being shared with ALON, as required by the FAR provision discussed above. Finally, in concluding that the organizational conflicts of interest here had been mitigated, the contracting officer relied upon certain "firewalls" that ALON agreed to establish. But, those "firewalls" appear to be little more than pledges by ALON that its employees who have had access, through the OCIO contracts, to other companies' proprietary information will not participate in preparing responses to ICE requests for proposals. This is a far cry from the sorts of detailed and verifiable firewall provisions that have been found adequate to mitigate other organizational conflicts of interest.[5]

Defendant and defendant-intervenor are largely left to argue that the agency's regulatory violations and other errors are not prejudicial because ALON provided the contracting officer declarations from the four individuals who were involved in preparing ALON's pricing proposal on the contract in question. Each of these declarations, in essence, states, under penalty of

---

[5] *See LEADS Corp.*, 2003 CPD ¶ 197 at 3 (2003) (describing firewalls such as: (i) separating the relevant personnel from other of contractor's business units electronically, organizationally, and physically; (ii) requiring continuous educations programs on the topic; (iii) nondisclosure agreements; (iv) implementing document control policies; (iv) auditing the firewall measures semi-annually; (v) continually updating the list of ongoing contract with agency); *see also Johnson Controls World Servs., Inc.*, 2001 CPD ¶ 20 at 2. The court is aware that the contracting officer's mitigation plan has other features (*e.g.*, security training), but those features do not diminish the court's concerns with the overall efficacy of that plan.

perjury, that the declarant did not have access to and did not use any of NetStar-1's proprietary information. The court has serious doubts regarding the reliance placed on these declarations for several reasons.

First, at this point, the court is unprepared to accept the proposition that an agency's failure to adhere to the FAR's various requirements regarding organizational conflicts of interest may be remedied by the simple expediency of obtaining declarations from the winning bidder averring that it did not take advantage of the unequal access to information that its employees possessed. Indeed, if the latter were enough, one must wonder why the drafters of the FAR bothered to develop an extensive set of rules to deal with such conflicts, or why those same drafters bothered recently to bolster those rules. *See* 28 C.F.R. §§ 9.501- 9.508; Federal Acquisition Regulation: Organizational Conflicts of Interest, 76 Fed. Reg. 23236, 23248-50 (proposed Apr. 26, 2011). If defendant is correct, all this effort could be replaced with a simple requirement that the awardee swear that it did not do anything improper. Second, while defendant and defendant-intervenor seem to think that these declarations, standing alone, are adequate to mitigate any conflicts of interest here, the contracting officer apparently believed otherwise. She relied upon a mitigation plan that had multiple prongs – declarations, non-disclosure agreements, firewalls, *etc.* – albeit prongs that, at least in part, seem to have been faultily executed. It is difficult to comprehend why the court should treat these declarations as independently dispositive when the contracting officer herself did not. And, indeed, the declarations in question are incomplete. While they contain assurances from ALON's pricing team, there are no comparable declarations from other ALON employees who were involved with the preparation of other aspects of ALON's offer (*e.g.*, the technical proposal), any of whom might have benefited from second- or third-hand knowledge of NetStar-1's proprietary information.

Finally, in the court's preliminary view, defendant's and defendant-intervenor's vigorous claim that these declarations foreclose a finding that there was any prejudice here seems to clash with cases that have held: (i) that the mere appearance of a conflict is enough to preclude an award, *see*, *e.g.*, *NFK Eng'g, Inc. v. United States*, 805 F.2d 372, 376 (Fed. Cir. 1986); *Turner*, 94 Fed. Cl. at 573; and, relatedly, (ii) that prejudice is presumed where proprietary information is available to an offeror, *see Turner*, 94 Fed. Cl. at 576; *ARINC Eng'g*, 77 Fed. Cl. at 203. These cases, indeed, raise in the court's mind whether the declarations of the sort at issue can be properly viewed as mitigation at all, at least as that concept is employed in the FAR. Accordingly, at least for the moment, the court believes that the four declarations in question do not bear the considerable weight that defendant and defendant-intervenor would heap upon them.

Based on these observations, the court finds that plaintiff has demonstrated a likelihood of prevailing on the merits in this case.

### B.     Irreparable Harm

Next the court must determine whether NetStar-1 is likely to suffer irreparable harm in the absence of preliminary relief. "The relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." *Magellan Corp. v. United*

*States*, 27 Fed. Cl. 446, 447 (1993). NetStar-1 complains that this court's failure to issue a preliminary injunction will result in a competitive disadvantage, asserting, *inter alia*, that ALON will be competitively advantaged by beginning its transition into the new contract. This court has acknowledged that a lost opportunity to compete may constitute an irreparable harm, *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 664 (2003); *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000); *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000). In the court's view, the injury claimed by plaintiff is in the same vein. *See Reilly's Wholesale Produce*, 73 Fed. Cl. at 717. Moreover, there is evidence that if a preliminary injunction is not granted, NetStar-1 will begin to lose key personnel – ALON, indeed, has already made an offer to NetStar-1's current program manager. Accordingly, the court finds that, on balance, plaintiff has adequately demonstrated that it will suffer irreparable harm if preliminary injunctive relief is not granted.

### C. Balance of Hardships

Next, the court must consider whether the balance of hardships leans in the plaintiff's favor. This requires a consideration of the harm to the government and to the intervening defendant. On this count, the government essentially asserts that the delay will prevent it from obtaining the benefits of the new contract. However, defendant, as well as the public at large, have a long-term interest in ensuring that any new contract for the services in question truly represents the best overall value to the government – a matter that at this point is in doubt. *See Serco, Inc. v. United States,* 81 Fed. Cl. 463, 502 (2008). Given the fact that there is no indication that issuing a preliminary injunction will impair the agency ability to obtain needed services – defendant readily admits that the existing bridge contract may be extended to September 28, 2011 – the court believes that these long-term interests are paramount here and are best served by issuing the proposed injunction. *See PGBA*, 57 Fed. Cl. at 663; *Metcalf Constr. Co. v. United States*, 53 Fed. Cl. 617, 645 (2002); *DTH Mgmt. Group v. Kelso*, 844 F. Supp. 251, 255 (E.D.N.C. 1993). In these circumstances, the balance of hardships tilts in NetStar-1's favor.

### D. Public Interest

Plaintiff also contends that the public interest will be served by granting the requested preliminary injunctive relief. "Clearly, the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *PGBA*, 57 Fed. Cl. at 663; *see also Rotech Healthcare, Inc. v. United States*, 71 Fed. Cl. 393, 430 (2006); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997); *Magellan Corp.*, 27 Fed. Cl. at 448. In the instant case, the public's interest likewise lies in preserving the integrity of the competitive process.

### III. CONCLUSION

The court finds that the prerequisites for issuing a preliminary injunction have been fully satisfied here. In consideration of the above:

1. Plaintiff's motion for preliminary injunction should be, and is hereby, **GRANTED**.

2. Defendant, acting by and through the Department of Homeland Security (and any agency thereof), as well as ALON Corp., are hereby **ENJOINED** from performing on contract No. HSCEMS-IO-Q-00015. Said parties also must suspend any related activities that may result in additional obligations being incurred by the United States under this contract.

3. Pursuant to RCFC 65(a), plaintiff shall give security in the amount of $100,000.00 for the payment of such costs and damages as may be incurred or suffered in the event that future proceedings prove that this injunction was issued wrongfully. Plaintiff shall file proof of security with the Clerk of Court. The Clerk shall hold the bond until this case is closed.

4. The court is prepared to move promptly to a determination of the ultimate merits in this matter. Toward that end, on June 1, 2011, the parties shall file with the court a joint status report proposing a schedule for final resolution of this matter.

5. This order shall be published as issued after June 9, 2011, unless the parties identify, with particularity, protected and/or privileged materials subject to redaction prior to said date.

**IT IS SO ORDERED**.

                                                s/ Francis M. Allegra
                                              Francis M. Allegra
                                              Judge