# 𝔍𝔫 𝔱𝔥𝔢 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 ℭ𝔩𝔞𝔦𝔪𝔰

No. 11-294C

(Filed Under Seal:  September 30, 2011)

Reissued:  October 17, 2011[1]

_____

|  |  |  |
|---|---|---|
| NETSTAR-1 GOVERNMENT CONSULTING, INC., | * * | |
| | * * | Post-award bid protest; Standard of review – *Bannum*; Organizational conflicts of interest; Success on the merits; FAR Part 9.5; Organizational conflict of interest – unequal access; Identification of organizational conflicts and mitigation efforts; Failure to identify conflict on timely basis; Failure to mitigate conflict; Agency conduct arbitrary, capricious and contrary to the FAR; Irreparable harm; Balance of hardships; Public interests; Injunction granted. |
| Plaintiff, | * * | |
| v. | * * | |
| THE UNITED STATES, | * * | |
| Defendant, | * * | |
| and | * | |
| ALON, INC., | * | |
| Defendant-Intervenor. | * * | |

_____

## OPINION AND ORDER
_____

*John J. O'Brien*, Cohen Mohr, LLP, Washington, D.C., for plaintiff.

*Daniel B. Volk*, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Tony West*, for defendant.

*Douglas L. Patin*, Bradley Arant Boult Cummings, LLP, Washington, D.C., for defendant-intervenor.

_____

[1]  An unredacted version of this opinion was issued under seal on September 30, 2011. The opinion issued today incorporates the arties' proposed redactions and corrects some minor nonsubstantive or typographical errors.  The redacted material is represented by brackets [ ].

**ALLEGRA, Judge:**

*"No man can serve two masters."* [2]

Before the court, in this bid protest action, are the parties' cross-motions for judgment on the administrative record.  At issue is whether a contracting officer's delayed identification of a potential organizational conflict of interest, and subsequent efforts to mitigate that conflict, constituted agency conduct that was arbitrary, capricious and otherwise contrary to law.  For the reasons that follow, the court answers this question in the affirmative.  It **GRANTS** plaintiff's motion for judgment on the administrative record and **DENIES** defendant's and intervenor's cross-motions for judgment on the administrative record.  An appropriate injunction is entered.

## I.    BACKGROUND

The administrative record in this case reveals the following:

In this post-award bid protest, NetStar-1 Government Consulting, Inc. (NetStar) challenges the award by the Department of Homeland Security, United States Immigration and Customs Enforcement (ICE), of a blanket purchase agreement (BPA) to ALON, Inc. (ALON) to provide program management support services for the ICE Office of the Chief Information Officer (OCIO).  The contract has an estimated value of $[].

On June 16, 2010, ICE sent out Request for Quotation No. HSCEMS-10-00015 (RFQ) to thirteen interested vendors, including plaintiff and defendant-intervenor, with the intention of awarding a single BPA.  A detailed statement of work (SOW) informed vendors that the BPA was to provide various support services to the OCIO.  These services included, among other things, program, financial, budget, and acquisition management support, as well as technical and engineering support.  The SOW identified the labor categories that could be used under the BPA and estimated for each of these a level of effort. [3]

The RFQ indicated that the BPA would be issued on the basis of a cost/technical tradeoff and identified the following non-price evaluation factors, in descending order of importance: technical/management approach, experience, and past performance.  Vendors were advised that the non-price factors, when combined, were significantly more important than price, but that price would become more important in making the award determination as technical quotations were found to be more equal.  With regard to price, the RFQ instructed vendors to provide labor rates for the thirty-four labor categories identified in the SOW.  The RFQ stated that the agency

---

[2]  Matthew 6:24 (quoted in Robert S. Pasley, "Organizational Conflicts of Interest in Government Contract," 1967 Wis. L. Rev. 5, 5 (1967) (hereinafter "Pasley")).

[3]  NetStar is the incumbent on the Atlas Program Support contract, a multi-year project for the design, acquisition, and integration of hardware and software for automating and modernizing OCIO's information technology infrastructure.  The majority of the work to be performed under the BPA supports the Atlas program.

was soliciting discounts from the vendors' Federal Supply Service (FSS) labor rates and instructed vendors to indicate whether they were offering such discounts.  The RFQ provided that the agency would evaluate price by adding the vendor's total base year price (determined by multiplying the vendor's quoted labor rates against the applicable estimated hours) and each of the total option year prices.[4]

The RFQ also included Homeland Security Acquisition Regulation (HSAR) clause 3052.209-72, Organizational Conflict of Interest (June 2006), which informed vendors that "this effort may result in an actual or potential conflict of interest, or may provide one or more offerors with the potential to attain an unfair competitive advantage," adding that the "nature of the conflict of interest . . . is unknown."  The clause warned that if such a conflict was found to exist, the contracting officer (CO) may: (1) disqualify the offeror, or (2) determine that it is otherwise in the best interests of the United States to contract with the offeror and include the appropriate provisions to avoid, neutralize, mitigate, or waive such conflict in the contract awarded."  The inserted HSAR clause required vendors to either:  (i) certify that, to the best of their knowledge, they were not aware of any facts which create an actual or potential organizational conflict of interest (OCI) related to award of the contract; or (ii) include in its proposal all information regarding the OCI and provide a mitigation plan if the vendor believed that the OCI could be avoided or neutralized.  The clause also provided that, where an actual or potential OCI exists, award would not occur before the CO evaluated whether the mitigation plan adequately neutralizes the OCI and the agency approves the plan.

On July 6, 2010, ICE received five quotations in response to the RFQ, including one from NetStar and another from ALON.  In their quotations, ALON and NetStar both indicated that they were unaware of any facts that would create an actual or potential OCI.  All five quotations were evaluated by the agency's technical evaluation team.  ALON's quotation was rated as [] overall, with a mix of [] and [] ratings on the three evaluation factors, while NetStar's quotation was rated [] overall, as well as under each of the non-price evaluation factors.  Although Netstar's quotation thus received a higher technical evaluation, ALON's price was $[] lower than NetStar's ($[] versus $[]).  The contracting specialist determined that the difference between the prices was that NetStar quoted [], whereas ALON quoted [].  The contract specialist concluded that ALON's quotation offered the best value to the agency, finding that NetStar's technical superiority did not warrant a [] percent price premium.  The CO, who was the source selection authority for the procurement, agreed with the contract specialist, and the agency issued the BPA to ALON.

_____

[4] In this regard, the RFQ provided –

[t]he Government will evaluate the price offered by extending the unit price by the estimated total units (for on-site and off-site) for each performance period (ordering periods 1 through 5, as appropriate).  The total price for each period will be added to determine a total price.  The evaluated price will be the sum of the quoted not-to-exceed amounts for each of the five (5) ordering periods of the term of the BPA based on the estimated level of effort . . . .

On September 15, 2010, ICE notified NetStar of the award to ALON; ICE then sent NetStar a debriefing letter on September 21, 2010.  On September, 23 2010, NetStar filed a protest at the General Accountability Office (GAO) alleging, *inter alia*, that ALON should have been eliminated from the competition because it had an unmitigated OCI that gave it an unfair competitive advantage over other vendors.  On September 26, 2010, the ICE CO issued a stop work order to ALON.  On October 25, 2010, ICE indicated to the GAO that it would take corrective action regarding the OCI allegations and "re-evaluate the information contained in the solicitation, any related contracts concerning Program Management Support Services within the ICE Office of the Chief Information Officer (OCIO), and agency employees with knowledge about these services in both the ICE Office of Acquisition Management and OCIO," adding that the CO would "document her findings in the contract file."  In view of this corrective action, on October 26, 2010, the GAO dismissed NetStar's protest as academic.

Subsequently, the CO reviewed the RFQ and related contracts concerning ICE support and determined that both ALON and NetStar had potential OCIs because of their access to various governmental databases.  On December 15, 2010, the CO wrote both parties requesting that they each provide mitigation plans addressing their access to agency shared network drives, software and budget execution plans (BEPs).[5]  On December 23, 2010, each contractor submitted the requested mitigation plan.  ALON's plan stated that it did not gain an unfair competitive advantage due to its access to proprietary information because "[a]ll contractors with access to ICE telecommunications and information systems are required by ICE to execute a DHS Form 11000-6, Sensitive But Unclassified Information Non-Disclosure Agreement (NDA), upon initial assignment to DHS in accordance with *DHS MD 4300,* and all contractor personnel attend security training."  Moreover, "only an employee and his/her manager has knowledge of system access requests.  All other ALON employees, to include the individuals participating in the ALON pricing proposal, have no knowledge of what onsite employee has access to which databases and information."  Attached to its OCI mitigation plan, ALON included signed declarations from the employees deemed by the CO to have had access to the agency Share Drive during the period in question, and who were involved in preparing ALON's bid for the contract at issue.  These documents are signed and dated December 20, 21, and 23, 2010.  In response to the CO's finding that four ALON employees had access to the overall BEP, ALON stated that "[w]e cannot identify who these individuals are because it is ALON's standard business practice to limit our knowledge of what databases our on-site employees can access."

---

[5] Each letter raised somewhat different issues owing to differences in the contracts that NetStar and ALON had performed for ICE.  As part of their existing contracts with ICE, both companies' employees had access to the agency's Shared Drive (which contained acquisition planning and procurement documents); however, the CO found that NetStar's employees' access to that drive had ended on February 23, 2010, whereas three ALON employees had access during the bidding period for the contract in question.  Similarly, while NetStar employees only had incidental access to the ICE Engineering Division's BEP as part of the Atlas program contract, the CO found that four ALON employees had access to the overall ICE BEP during the procurement process.

On January 11, 2011, the CO found both ALON's and NetStar's mitigation plans were acceptable.  The CO's analysis of ALON's mitigation heavily relied upon the declarations from ALON's employees denying any wrongdoing and assuring that they had complied with their nondisclosure agreements.  The CO concluded that "ALON has proposed an acceptable approach that is currently in effect to mitigate the potential OCI of access" to the three sources of proprietary information she previously identified – the BEP, as well as the Shared Drive and PRISM databases.  In this regard, the CO further concluded that "[f]or the identified potential OCIs, ALON has business practices in place that have prevented the disclosure of advantageous and confidential information to the ALON employees working on the RFQ's response."[6]

On January 31, 2011, the CO, through an addendum to her original award decision, reinstated the contract award to ALON and cancelled the September 26, 2010, stop work order.  ALON was informed of these actions in a letter in which the CO stated:

> Based on a thorough assessment of your response submitted on December 23, 2010, the Contracting Officer has determined that your firm has submitted an acceptable Organizational Conflict of Interest (OCI) Mitigation Plan.  In addition, for the identified potential OCIs, your firm has business practices in place that have prevented the disclosure of advantageous and confidential information to ALON employees working on the response to Request for Quotation (RFQ) HSCEMS-10-Q-00015.

On February 3, 2011, NetStar filed a second GAO protest.  On February 8, 2011, ICE issued a second stop work order.  On May 4, 2011, the GAO denied Netstar's second protest, upholding the CO's finding "that ALON did not have an unequal access to information OCI and that its quotation still presented the best value to the agency."

On May 11, 2011, NetStar filed its complaint in this court along with, *inter alia*, an application for a temporary restraining order and a motion for a preliminary injunction.  On May 12, 2011, ALON filed a motion to intervene as a defendant-intervenor, which the court granted on May 13, 2011.  Following briefing and oral argument, the court, on May 27, 2011, granted plaintiff's motion for preliminary injunction.  *See NetStar-1 Gov't Consulting, Inc. v. United States*, 98 Fed. Cl. 729 (2011).  On June 29, 2011, the parties simultaneously filed motions for judgment on the administrative record; thereafter, on July 29, 2011, they simultaneously filed responses.  On August 10, 2011, defendant filed a motion to dismiss this case under RCFC 12(b)(1), asserting that the case was moot because the agency was prepared to review the OCIs potentially lurking in the case.  On August 19, 2011, the court denied this motion, noting that the agency had not proposed to rescind the award to ALON.  On September 6, 2011, defendant filed a motion to remand the case to allow the CO to reconsider whether the OCI in this instance was

---

[6] The analysis does not reflect that the CO conducted any independent investigation of the matters asserted or interviewed any of the ALON employees affected – and, indeed, defendant confirms that no such investigation or interviews occurred.

significant.  The court also denied this motion.  On September 14, 2011, the court conducted oral argument on the cross-motions.[7]

## II.   DISCUSSION

Before turning, in detail, to plaintiff's substantive claims, we begin with common ground.

### A.   Standard of Review

The Federal Circuit, in *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005), instructed that courts must "distinguish . . . [a] judgment on the administrative record from a summary judgment requiring the absence of a genuine issue of material fact." *Bannum* teaches that two principles commonly associated with summary judgment motions – that the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences must be weighed in favor of the non-moving party – do not apply in deciding a motion for judgment on the administrative record.  *Id.* at 1356.  The existence of a question of fact thus neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full blown evidentiary proceeding.  *Id.*; *see also Int'l Outsourcing Servs. LLC v. United States*, 69 Fed. Cl. 40, 45-46 (2005).  Rather, such questions must be resolved by reference to the administrative record, as properly supplemented – in the words of the Federal Circuit, "as if [the Court of Federal Claims] were conducting a trial on [that] record." *Bannum*, 404 F.3d at 1354; *see also NEQ, LLC v. United States*, 88 Fed. Cl. 38, 46 (2009); *Int'l Outsourcing*, 69 Fed. Cl. at 46; *Carlisle v. United States*, 66 Fed. Cl. 627, 631 (2005).

*Bannum*'s approach is well-suited to the limited nature of review in bid protests.  In such cases, this court will enjoin defendant only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A); *see also* 28 U.S.C. § 1491(b)(4).  By its very definition, this standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. NRDC, Inc.*, 462 U.S. 87, 105 (1983); *see Glenn Defense Marine (Asia) PTE, Ltd. v. United States*, 97 Fed. Cl. 311, 317 (2011); *Gulf Group, Inc. v. United States*, 56 Fed. Cl. 391, 396 n. 7 (2003).  As the focus of this standard is more on the reasonableness of the agency's result than on its correctness, the court must restrain itself from examining information that was not available to the agency.  Failing to do so, the Federal Circuit recently observed, risks converting arbitrary and capricious review into a subtle form of *de novo* review.  *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379–80 (Fed. Cir. 2009).  At all events, this court will interfere with the government procurement process "only in extremely limited circumstances." *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983)).

---

[7]  NetStar, which was the incumbent on a prior related contract, provided the services in question under a bridge contract that expired September 28, 2011.  The court is unaware whether this contract has been extended further.

The aggrieved bidder must demonstrate that the challenged agency decision was either irrational or involved a clear violation of applicable statutes and regulations. *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004), *aff'g*, 56 Fed. Cl. 377, 380 (2003); *see also ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 201 (2007). Moreover, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).[8] "Finally, because injunctive relief is relatively drastic in nature, a plaintiff must demonstrate that its right to such relief is clear." *NEQ*, 88 Fed. Cl. at 47; *see also Banknote Corp.*, 56 Fed. Cl. at 380–81; *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 566 (2000).

### B.   Alleged Errors in the Procurement Process

It is with this basic analytical framework in mind that the court now turns to the specific allegations of error here.

Initially, the court must determine whether the award decision, and the agency conduct leading up to it, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 28 U.S.C. § 1491(b)(4). The court may overturn a procurement decision where "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *see also Axiom*, 564 F.3d at 1381. NetStar contends that the award in question was flawed by the existence of an unmitigated OCI that stems from ALON's access to information gained from its performance of other ICE contracts.

---

[8] Federal Circuit cases indicate that this prejudice analysis comes in two varieties. The first is that described above – namely, the ultimate requirement that a protestor must show prejudice in order to merit relief. A second prejudice analysis is more in the nature of a preliminary standing inquiry. In this regard, the Federal Circuit has held that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *see also Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002); *Overstreet Elec. Co., Inc. v. United States*, 59 Fed. Cl. 99, 109 n. 5 (2003). Cases construing this second variation on the prejudice inquiry have held that it requires merely a "viable allegation of agency wrong doing," with "'viability' turning on the reasonableness of the likelihood of prevailing on the prospective bid taking the protestor's allegations as true." *McKing Consulting Corp. v. United States*, 78 Fed. Cl. 715, 721 (2007); *see also 210 Earll, L.L.C. v. United States*, 77 Fed. Cl. 710, 719 (2006); *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 284-85 (2006). Because of the central nature of the allegation of error here, the court is convinced that plaintiff has met this preliminary "standing" threshold – and defendant does not contend otherwise.

The Federal Acquisition Regulation (FAR) (48 C.F.R.) tasks contracting officers with the responsibility to "analyze planned acquisitions in order to (1) [i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible; and (2) [a]void, neutralize, or mitigate significant potential conflicts before contract award." FAR § 9.504(a); *see also* Steven W. Feldman, Government Contract Guidebook §3:35 (2010). The FAR requires that "[e]ach individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract," adding that "[t]he exercise of common sense, good judgment, and sound discretion is required on whether a significant potential conflict exists and, if it does, the development of an appropriate means for resolving it." FAR § 9.505. The FAR thus recognizes that "the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion." *Axiom*, 564 F.3d at 1382; *see also PAI Corp. v. United States*, 614 F.3d 1347, 1351-52 (Fed. Cir. 2010).

That discretion, however, is not unbounded. The process of identifying and mitigating a conflict is not a bureaucratic drill, in which form is elevated over substance, and reality is disregarded. Nor is it a check-the-box exercise, in which the end result – that the OCI is mitigated – is all but preordained. Rather, as will be seen, the FAR calls upon the CO to conduct a timely and serious review of the facts presented. And, if that review reveals a potential and significant OCI, the FAR gives the agency three – and only three – choices: develop a mitigation plan that truly negates the anticompetitive advantage associated with that conflict, forego an award as indelibly tainted, or, in the rare case, waive the conflict and proceed. It is within this regulatory context that the CO's discretion lies. This court will not overturn the CO's determinations in this context unless they are arbitrary, capricious, or otherwise contrary to law. *Id.* at 1352; *see also John C. Grimberg Co.*, 185 F.3d at 1300; *DSD Labs., Inc. v. United States*, 46 Fed. Cl. 467, 471 (2000). To demonstrate that the latter is the case, a protester challenging the CO's decision regarding an OCI must "identify 'hard facts;' mere inference or suspicion of an actual or apparent conflict is not enough." *PAI*, 614 F.3d at 1352 (quoting *C.A.C.I.*, 719 F.2d at 1581); *see also Filtration Dev. Co., LLC v. United States*, 60 Fed. Cl. 371, 380 (2004).

### 1.      Organizational Conflicts of Interest – Unequal Access

At issue in this case is whether there was an "unequal access to information" OCI here. Such an OCI arises when the contractor has access to "[s]ource selection information . . . that is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract." FAR § 9.505-4; *see also Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 569 (2010), *aff'd*, 645 F.3d 1377 (Fed. Cir. 2011); Keith R. Szeliga, "Conflict and Intrigue in Government Contracts: A Guide To Identifying and Mitigating Organizational Conflicts of Interest," 35 Pub. Cont. L. J. 639, 643 (2006) (hereinafter "Szeliga"). As the FAR makes clear, this category of OCI raises concerns that a firm may gain a competitive advantage based on its possession of "[p]roprietary information that was obtained from a Government official without proper authorization." FAR § 9.505(b). The FAR cautions that such conflicts are more likely to occur as the result of contracts involving management support services, the type of contract that ALON had with ICE. *See* FAR 9.502(b)(1).

There are hard facts here that strongly suggest the existence of an OCI associated with ALON's having had unequal access to information that could have provided it with a significant

competitive advantage in obtaining the BPA.  *See ARINC Eng'g Servs.,* 77 Fed. Cl. at 202.  The record reveals that at least four ALON employees had access to the complete BEP and regularly used information from that plan in providing support services to the OCIO.  As described by one ICE manager, that information included "vendor name, contract number, . . . period of performance, . . . contract employee name, labor category, job description, fully loaded rates, estimated number of employee hours, and anticipated funding source and amount."  The complete BEP captures the budget requirements for all program offices within the OCIO and included information regarding NetStar's prior performance of the contract in question.  Moreover, it appears that another dozen ALON employees had access to the BEP of OCIO's Engineering Division, which tracked NetStar's performance of the Atlas contract and also included its labor rates.  Contrary to defendant's claims, NetStar did not have comparable access to ALON's proprietary information.  NetStar's employees did not have access to the complete BEP, but only had access to the BEP of OCIO's Engineering Division, which plan did not contain ALON's labor rates.[9]

There is little doubt that the potential conflict posed by ALON's unequal access to information was significant.  "A significant potential conflict is one which provides the bidding party a substantial and unfair competitive advantage during the procurement process on information or data not necessarily available to other bidders."  *PAI*, 614 F.3d at 1352; *see also ARINC*, 77 Fed. Cl. at 202.  Here, ALON stood to gain a competitive advantage if it used proprietary information regarding, *inter alia*, its competitor's labor rates in crafting its own bid, as the cost evaluation model used to award the BPA in question was based solely on the offerors' fully loaded labor rates.  Indeed, the administrative record reveals that ALON was awarded the contract in question under a best-value, technical-cost trade-off decision, based on its having a lower price than that offered by NetStar.  *See* FAR § 15.101-1.  Defendant has conceded that, in a situation like this – where one competitor has another contractor's labor rates and price is a determining factor in a subsequent award – any resulting OCI is significant.  It contends, however, that the CO here identified this potential OCI on a timely basis and crafted a mitigation plan that ensured that ALON did not derive any competitive advantage by virtue of its access to NetStar's trade secrets.  It remains to be seen, however, whether this is actually the case.

## 2.      Timely Identification

The FAR emphasizes that the CO should determine the existence of a significant OCI "as early in the acquisition process as possible."  FAR § 9.504(a).  The operation of a whole host of FAR provisions depends upon this happening.  FAR § 9.506(b), for example, provides that if "the contracting officer decides that a particular acquisition involves a significant potential organizational conflict . . . , the contracting officer shall, before issuing the solicitation, submit for approval to the chief of the contracting office . . . [a] written analysis, including a recommended course of action for avoiding, neutralizing or mitigating the conflict," as well as "a

---

[9]   The CO also found that six NetStar employees had access to the agency's Shared Drive, but that this access terminated February 23, 2010, well before the RFQ in question was issued.  Likewise, while the CO found that two NetStar employees had access to the agency's PRISM database, she did not indicate whether that database included ALON's labor rates.

draft solicitation provision and . . . a proposed contract clause." An approving official is then entrusted to "[r]eview the contracting officer's analysis and recommended course of action, including the draft provision and any proposed clause . . . and . . . [a]pprove, modify, or reject the recommendations in writing."[10] FAR § 9.506(d)(3) requires that "[b]efore awarding the contract, [the contracting officer shall] resolve the conflict or the potential conflict in a manner consistent with the approval or other direction by the head of the contracting activity." Providing an overarching summary of this process, FAR § 9.504(a) indicates that the contracting officer shall analyze planned acquisitions in order to "[a]void, neutralize, or mitigate significant potential conflicts before contract award." *See also Turner*, 645 F.3d at 1386; *Jacobs Tech.*, 2011 WL 3555595, *11 (Fed. Cl. July 29, 2011).

All of these provisions anticipate, in one way or another, that, as part of acquisition planning, the CO will "identify and evaluate potential conflicts in the early stages of the acquisition process." *Turner*, 645 F.3d at 1386; *see also*; *PAI*, 614 F.3d at 1352; *Jacobs Tech., Inc.*, 2011 WL 3555595 at *11; *The Geo Group, Inc. v. United States*, 2011 WL 3455823, at *4 (Fed. Cl. July 29, 2011). As noted by two prominent commentators, "FAR 9.504, 9.506 and 9.507 seem to direct COs to figure out potential organizational conflicts of interest before a solicitation is issued and either mitigate potential conflicts before award, include restrictions in the solicitation to avoid the conflict of interest, or disqualify an offeror from a competition." Ralph C. Nash & John Cibinic, "Conflicts of Interest: The Guidance in the FAR," 15 No. 1 Nash & Cibinic Rep. ¶ 5 (2001).[11] In this case, however, the contracting officer did not ascertain the existence of a potential OCI prior to the issuance of the RFQ, or even after receiving proposals,

---

[10] It should not be overlooked that the primary purpose for drafting such solicitation provisions is to avoid OCIs in the future by putting the awardee on notice as to limitations on its ability to obtain other contracts. *See* FAR §§ 9.507-1, 9.507-2; *see also* Megan A. Bartley, "Too Big to Mitigate? The Rise of Organizational Conflicts of Interest in Asset Management," 40 Pub. Cont. L. J. 531, 541 (2011). Nonetheless, the FAR plainly anticipates that clauses may be inserted into a solicitation to negate the impact of potential "unequal access to information" OCIs caused by prior awards. Indeed, as one commentator has observed, FAR § 9.502 "cautions that the analysis of OCIs is both retrospective and prospective." Szeliga, *supra*, at 643. In this regard, FAR § 9.502 explains that:

> An organizational conflict of interest may result when factors create an actual or potential conflict of interest on an instant contract, or when the nature of the work to be performed on the instant contract creates an actual or potential conflict of interest on a future acquisition.

48 C.F.R. § 9.502(c).

[11] *See also* Szeliga, *supra*, at 644-45; James W. Taylor & B. Alan Dickson, "Organizational Conflicts of Interest Under the Federal Acquisition Regulation," 15 Pub. Cont. L.J. 107, 113 (1984) (hereinafter "Taylor & Dickson") ("Contracting officers are required to identify, evaluate and take some sort of action on conflicts early in the acquisition cycle and specifically before contract award.").

but instead made no such determination until NetStar protested the first award to ALON.  This delay, in and of itself, is not indicative of arbitrary action because the existence of a potential significant conflict of interest is not always apparent before the issuance of a solicitation, and sometimes cannot be identified until after an award and a bid protest.  *See Turner*, 645 F.3d at 1386.  But, by the same token, a CO may not "ignore and not evaluate known potential OCIs prior to award."  *Id.*; *see also Alion Sci. & Tech. Corp.*, 2006 C.P.D. ¶ 2 (2006).  And that would appear to be the case here.

In the case *sub judice*, the CO knew or should have known, well before the issuance of the RFQ, that ALON was performing advisory and assistance services for the OCIO that raised serious questions regarding its participation in other procurements by that same office.  No less than three of ALON's prior contracts/task orders with OCIO, issued from September 2008 through June 2009, explicitly warned that its performance thereunder could cause future OCIs by providing the company with a competitive advantage derived from "access to proprietary, business confidential, or financial data of other companies."  In each of these instances, the contracting officer responsible for those procurements inserted into the contract clause I.9 HSAR 3052.209-73, entitled "Limitation on Future Contracting," which stated, in relevant part:

> (a)  The Contracting Officer has determined that this acquisition may give rise to a potential organizational conflict of interest.  Accordingly, the attention of prospective offerors is invited to FAR Subpart 9.5 – Organizational Conflicts of Interest.

> \*          \*          \*          \*          \*

> (c)  The restrictions upon future contracting are as follows:

> \*          \*          \*          \*          \*

> (2)  To the extent that the work under this contract requires access to the proprietary, business, confidential, or financial data of other companies, and as long as these data remain proprietary and confidential, the Contractor shall protect these data from unauthorized use and disclosure and agrees not to use them to compete with those other companies.

Who was the contracting officer who inserted this clause?  The one who "determined that this acquisition may give rise to a potential organizational conflict of interest"?

In two of the three instances, it was none other than the CO who issued the RFQ in question.  Yet, rather than checking her own files and addressing these OCI issues head on prior to issuing the RFQ, the CO relied upon the offerors to identify in their proposals any OCIs they thought existed.  This was unacceptable.  The relevant FAR provisions and the case law construing them expect more – they do not permit agency officials to sit passively by, waiting to be alerted to the potential existence of an OCI by contractors bidding on a solicitation, when the

agency's own records (not to mention its daily operations) readily disclose the existence of potential problems. [12]

Contrary to defendant's claims, this is not asking too much. To the contrary, the FAR proceeds from the reasonable assumption that agencies which consistently follow its procedures for protecting third-party information will know when an envisioned solicitation poses potential conflicts. That is why FAR provisions, like § 9.506, require contracting officers to insert cautionary clauses in certain contracts. And it is why FAR § 9.505-4(b) requires agencies to obtain nondisclosure agreements from contractors who, through their government contracts, have access to the proprietary information of potential competitors. The latter subsection states that "[a] contractor that gains access to proprietary information of other companies in performing advisory and assistance services for the Government must agree with the other companies to protect their information from unauthorized use or disclosure for as long as it remains proprietary and refrain from using the information for any purpose other than that for which it was furnished." *Id*. It adds that "[t]he contracting officer shall obtain copies of these agreements and ensure that they are properly executed."

The CO here never enforced these provisions. Defendant admits as much even while acknowledging that OCIO's contracts with ALON plainly involved the performance of advisory and assistance services. [13] OCIO was not required to obtain such agreements, defendant asserts, because FAR § 9.505-4(b) applies only where a government contractor obtains proprietary information directly from a third party and not where, as here, the contractor obtains that information indirectly from an agency. The plain wording of the regulation, however,

---

[12] Further evidence of this duty may be found in FAR § 9-506(a), which states that "[i]f information concerning prospective contractors is necessary to identify and evaluate potential organizational conflicts of interest . . . , contracting officers should first seek the information from within the Government . . . . Government sources include the files and the knowledge of personnel within the contracting office, . . ." *See also The Analysis Group, LLC*, 2009 CPD ¶ 237 at 4 (2009) ("agencies must give consideration not only to information that may have been furnished by a firm, but also must consider, as appropriate, the scope of products manufactured or services provided by the firm . . . an agency may not, in effect, delegate to the contractor itself complete responsibility for identifying potential OCIs"); *L-3 Servs. Inc.*, 2009 CPD ¶ 171 (2009) ("An agency's reliance on a contractor's self-assessment of whether an organizational conflict of interest exists . . . is inconsistent with the FAR."); *Johnson Controls World Servs., Inc.*, 2001 CPD ¶ 20 at 6 (2001) ("[T]he [agency] proceeded as if the clause were self-executing . . . beyond compliance with the FAR, the agency's approach of essentially leaving the determination of the existence, as well as the mitigation, of a potential conflict solely to the contractor – who is not in a position to make an objective judgment – simply is not a reasonable means of avoiding or mitigating an OCI.").

[13] The FAR defines "advisory and assistance services" as "those services provided under contract by nongovernmental sources to support or improve: organizational policy development; decision-making; management and administration; program and/or project management and administration; or R&D activities." FAR § 2.101.

contradicts this notion – it makes no such distinction based on *how* a contractor "gains access to propriety information of other companies in performing advisory and assistance services."[14] Nor, contrary to the intervenor's claims, is there anything about the regulatory context of this language that leads to a contrary conclusion.[15]  Indeed, the authorities on this point have all uniformly construed this FAR provision as applying to situations like this, where the employee of a contractor is given access by an agency to a third party's proprietary information.[16]

---

[14]  The concept of having contractors agree with the owner of proprietary data to protect the same from unauthorized disclosure dates back to the original Department of Defense Code on this subject that was issued in 1963.  The fourth rule in that Code stated:  "If a contractor agrees to conduct studies or provide advice concerning a system, which work requires access to proprietary data of other companies, the contractor must agree with such companies to protect such data from unauthorized use or disclosure so long as it remains proprietary."  DOD Directive 5500.10, 32 C.F.R. § 141.2(b); *see also* Pasley, *supra*, at 22.

[15]  Defendant and intervenor make two arguments in this regard.  First, intervenor notes that 9.505-4(a) discusses the need for restrictions on disclosure to be imposed where "a contractor requires proprietary information from others to perform a Government contract and can use the leverage of the contract to obtain it."  But, there is no indication that the nondisclosure agreements referenced in FAR 9.505-4(b) are required only in this situation.  Rather, it appears that each of the paragraphs in FAR 9.505-4 deals with a different situation: (i) paragraph (a) deals with situations in which a contractor can use its government contract as leverage to obtain information from another corporation; (ii) paragraph (b) deals with situations where "[a] contractor . . . gains proprietary information of other companies in performing advisory and assistance series for the Government;" and (iii) paragraph (c) deals with situations where a contractor "obtain[s] proprietary and source selection information by acquiring the services of marketing consultants."  There is no indication that the paragraphs were intended to be interdependent.  For its part, defendant attempts to narrow the plain reading of 9.504(b) by citing an example contained in FAR § 9.508(h), which involves a situation where an agency asks firms doing research on the use of lasers to make proprietary information available to a company that has been hired by the agency to study the use of lasers.  This, of course, is a good example of the situation that arises under FAR 9.505-4(a), but does not limit the construction of FAR 9.505-4(b).  At all events, FAR 9.508 states that the examples contained therein "are not all inclusive."

[16]  For cases construing the FAR in this way *see In Re Enterprise Information Servs.*, 2011 WL 4015522 at *9 (Comp. Gen. Sept. 2, 2011); *Snell Enters., Inc.*, 2002 C.P.D. ¶ 115 at 6 n.1 (2002) ("We note that FAR § 9.505-4(b) provides that where a contractor obtains access to another contractor's proprietary data, it must enter into an agreement with the other contractor to protect information from unauthorized use."); *Medical Serv. Corp., Int'l*, 94-1 C.P.D. ¶ 305 at 5 (1994); *see also L-3 Servs., Inc.*, 2009 C.P.D. ¶ 171 (2009); *AT&T Gov. Servs., Inc.*, 2008 C.P.D. ¶ 170 at 1 (2008) (noting an agency solicitation that construed the regulation in this fashion).  For a prominent commentator's construction, *see* Ralph C. Nash, "Postscript II:  Mixed Workforce Questions," 21 No. 2 Nash & Cibinic Rep. ¶3 (2007) (noting that the regulation applies "to contractors working in the agency" where a "company provide[s] . . . proprietary information to the Government.").  For an agency construction, *see* National Aeronautics and

- 13 -

Defendant and intervenor cite no authorities to the contrary – and for good reason, as research reveals none.  This result is not surprising as it is hard to read the language of this provision in the cramped way defendant and the intervenor contend, let alone to understand why the drafters of the FAR would provide this protection to the proprietary information of some contractors, but not to that of others.[17]

Had the agency complied with this provision and required ALON to enter into nondisclosure agreements with outside contractors, the CO would have had further warning that the issuance of the RFQ here posed a potential significant OCI that needed to be promptly addressed in the fashion specified by the FAR.  The very existence of such agreements would have screamed this out.  Of course, even without such nondisclosure agreements, the CO should have been aware of the contracts that she herself previously awarded and was administering, under which ALON was providing advisory and assistance services.  And she should have known this before issuing the RFQ and, ironically enough, specifically inviting ALON to submit a response thereto.

But these findings do not end our inquiry.  While the FAR plainly adopts a strong preference in favor of resolving OCIs earlier rather than later, the failure by an agency to identify the existence of a potential significant OCI before the issuance of a solicitation is not fatal, so long as the agency can implement an effective mitigation plan.  Whether ICE did so here is a topic to which the court now turns.

---

Space Adm., Proposed Rules, 75 Fed. Reg. 9860-01 (March 4, 2010) (construing 9.505-4(b) as applying to government informational sources); National Aeronautics and Space Adm., Final Rules, 70 Fed. Reg. 35549-02 (June 21, 2005) (same).

[17] Defendant asserts that the contractual requirements of FAR § 9.505-4(b) are not enforceable via protest.  It cites, in this regard, *Galen Med. Assoc., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004), for the proposition that "[n]ot every regulation is established for the benefit of bidders as a class, and still fewer may create enforceable rights for the awardee's competitors."  But this claim bespeaks a misunderstanding of what NetStar is arguing.  It is not relying upon the violation of FAR 9.505-4(b) as a basis for sustaining its protest, but rather cites that violation only as indication that the agency should have ascertained the potential for a conflict here much earlier.  At all events, it makes little sense to view FAR § 9.505-4(b), which is intended to protect the proprietary information of third parties, as not being designed to "benefit . . . bidders as a class."  *Galen Med. Assoc.*, 369 F.3d at 1330.  Defendant also contends that plaintiff's invocation of this regulation is untimely – that it should have noted the agency's noncompliance with the regulation prior to the award decision.  *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).  But, this claim conveniently ignores the fact that NetStar did not know that ALON was bidding on the RFQ until after the award decision was announced.  No doctrine or case requires a potential protestor to be clairvoyant or to police an agency's general noncompliance with the FAR on the possibility that such misfeasance might become relevant in a protest.

### 3.    Mitigation

FAR § 9.504(e) prohibits a CO from awarding a contract if an OCI cannot be avoided or mitigated.  *See Axiom*, 564 F.3d at 1382; Robert S. Metzger, "Final DFARS OCI Rules – A Retreat From What Some Feared, A Sign of What is to Come," 53 No. 5 Gov't Contractor ¶ 35 (2011).  Defendant and intervenor argue, however, that the contracting officer effectively mitigated any potential conflicts of interest here.   In fact, though, a probing review of her conduct in this regard reveals that it was arbitrary and capricious.

In granting plaintiff a preliminary injunction in this case, this court observed that "[t]he mitigation plan adopted by the contracting officer has some interesting features."  *NetStar-1 Gov't Consulting*, 98 Fed. Cl. at 733.  Quite candidly, the court did not intend the term "interesting" to be complimentary.  Further review of the record has confirmed the gross inadequacy of the plan adopted by the CO.  As will be discussed below, some of the provisions of that plan were defective in their design; others were flawed in their execution; and still others required the CO to rely upon ALON's representations and promises, without any verification whatsoever and despite indications that procedures for protecting proprietary information had not been strictly followed in the past.

Some of the provisions embraced by the CO plainly were ineffective and should have been seen as such.  As part of its plan, for example, ALON provided the CO with declarations from certain ALON employees working at OCIO, who indicated that they had not obtained NetStar proprietary information or shared that information with other ALON officials.  The problem was that these declarations did not come from the ALON employees who had access to NetStar's proprietary information.  As since admitted by defendant, declarations from the dozen or so ALON employees who did have that access were never obtained.  This is problematic not just because the CO relied upon declarations from the wrong people, but because neither she nor ALON apparently did enough of an investigation to know who these people were, at least initially.  Indeed, ALON has admitted that, under its internal operating procedures, the only ALON employees who knew who had access to the various OCIO databases were the employees themselves.  No outside supervisors were given this information.  While ALON touts this lack of knowledge as a double-blind "firewall," it is only half right – its willful blindness left it unable to verify and ensure that its nondisclosure policies were being complied with, and to report to the agency if they were not.  And, as it turns out, they were not.

In embracing other provisions, the CO blithely assumed that the OCIO and ALON would comply with procedures that they had failed to observe in the past.  A prime example of this was the CO's reliance on ALON's assertion that the relevant ALON employees had all signed DHS nondisclosure agreements.  But, all but one these agreements were not dated, leaving open questions as to when they were signed.  Moreover, none of them were approved by the companies whose proprietary information was being shared with ALON, as required by the FAR § 9.505-4(b).  Defendant, however, contends that these facts are irrelevant because OCIO required that the agreements be witnessed by OCIO personnel and because the agency

maintained copies of the signed agreements in its contract files.[18]  Unfortunately, these factual representations appear false.

---

[18]  The following exchange occurred between the court and government counsel at the oral argument held on September 14, 2011 (10:40:58 am to 10:42:39 am):

| | |
|---|---|
| COURT: | "So they had to be signed, right?" |
| DEFENDANT: | "They did." |
| COURT: | "Some of the ones here, I thought, have some problems, at least with the dating.  They don't indicate the date that they were signed, do they?" |
| DEFENDANT: | "We're not sure that's a problem, Your Honor.  There's no … I'm not sure there's a place on the form where it requires the date to be put in and isn't." |
| COURT: | "So the agency doesn't care when the document is signed?  I would think that if they cared, that they would really want to make sure that the document is in place before the person had access to the documents, correct?" |
| DEFENDANT: | "And I think they certainly did, Your Honor." |
| COURT: | "Well, wait a minute, I thought – correct me here on the facts – I thought that some of these nondisclosure agreements were actually being received as part of the mitigation plan, that in other words, they're not received at the time of the initial letting of the contracts. |
| DEFENDANT: | "Actually, I don't think that's right, Your Honor." |
| COURT: | "So let me pin you down on this and make sure I understand what you're telling me, and I'll go back and check.  The nondisclosure agreements that were signed by the relevant employees here, okay, you're saying were signed well in advance, I guess, of this procurement because they would have been signed as part of the earlier procurements, correct?" |
| DEFENDANT: | "That's the finding that the administrative record supports, in our view.  And the reason is that, uh, … the reasons are … that, the contracts require these things to be signed before access.  The declarations that were received indicated from these people that these NDAs were signed before they received access." |

- 16 -

Contradicting this claim is a series of startling electronic communications between OCIO and ALON personnel in late October of 2010, after NetStar had filed its protest of the first award. These messages reveal that, as of October 21, 2010, the agency did not have copies of many of the relevant DHS nondisclosure agreements in its contract files and, instead, was scrambling to locate these agreements. Some of these agreements could not be found within the agency and were provided by ALON – one message from the Contracting Officer Technical Representative (COTR) on the ALON contracts to an ALON supervisor listed particular nondisclosure agreements that were missing and indicated that they were needed "within 1 hour;" a later message from the same person requested the same forms "ASAP." Responding messages from ALON indicate that they were having problems locating some of the agreements and needed to confirm with the affected employees whether they had signed such an agreement. ALON began providing copies of these agreements to OCIO on October 22, 2010 – months, of course, after the CO had invited ALON officials to prepare a response to the RFQ. Still more troubling, these electronic messages reveal irregularities in the execution of these agreements. Several indicate that at least one of the nondisclosure agreements found was not witnessed by an OCIO employee, evidenced by messages from ALON requesting an OCIO employee to sign off on the agreements then. These messages suggest that neither OICO nor ALON was bothered by the prospect of having OCIO employees countersign these agreements after-the-fact, without having actually witnessed the original signature. Other documents suggest that at least some of the nondisclosure agreements were countersigned not by OCIO employees, but rather by ALON employees.

The court cannot help but presume that the CO was aware of these problems (it was her COTR, after all, that sent most of the messages described above) when, on January 10, 2011, the CO approved ALON's mitigation plan. That plan relied heavily upon ALON and OCIO promising to comply with procedures that the CO knew they had violated in the past. This disconnect between past performance and future promises is not only irrational *in ipsum*, but also raises serious questions as to the CO's judgment in relying, without any verification whatsoever, upon other critical representations made by ALON in its plan. For example, in concluding that the OCI here had been mitigated, the CO relied upon ALON's policy of having its employees sign internal nondisclosure forms and receive security training. Yet, there is no indication that she verified that such steps had occurred by the time of the procurement in question. The CO also did not probe what ALON meant when it averred in its plan that it had established "firewalls." Those "firewalls" were not described in any detail in the plan and instead appear to be little more than pledges by ALON that its employees with access, through the OCIO contracts, to other companies' proprietary information would not participate in preparing

---

| COURT: | "Alright, so if I found that in fact … How do I know that if they're not dated?" |
|---|---|
| DEFENDANT: | [long pause] "Again, I think it's those same reasons. The evidence that is in the administrative record, there's no basis to make the conclusion that they weren't executed properly and that they weren't signed when they were required to be signed." |

responses to ICE requests for proposals.  Such bare bone promises are a far cry from the detailed procedures, as well as physical and electronic barriers, that the decisional law have found adequate to mitigate "unequal access to information" OCIs.[19]  These cases reveal that even when such promises are reduced to paper, they lack the inhibitory and refractory characteristics generally associated with effective firewalls.

Defendant and defendant-intervenor are left to argue that the potential OCI here was mitigated because ALON provided the CO with declarations from the four individuals who were involved in preparing ALON's pricing proposal on the contract in question.  Each of these declarations stated, under penalty of perjury, that the declarant did not have access to and did not use any of NetStar's proprietary information.  In the circumstances of this case, however, the CO's reliance on these declarations was arbitrary and capricious.

For one thing, there is no indication that an agency's failure to adhere to the FAR's requirements regarding OCIs may be remedied by the expediency of obtaining *post hoc* declarations from the winning contractor denying any wrongdoing.  Can it be that the drafters of the FAR dedicated a whole subpart's worth of guidance to how and when to identify such conflicts, as well as how and when to mitigate the conflicts so identified, yet subscribed to the notion that the failure to follow these procedures could be cured by having the awardee swear up and down it did nothing improper?  Of course not.  As this court stated in granting plaintiff's motion for preliminary injunction, "if the latter were enough, one must wonder why the drafters of the FAR bothered to develop an extensive set of rules to deal with such conflicts . . ." *NetStar-1 Gov't Consulting,* 97 Fed. Cl. at 734.  Under well-established principles of administrative law, this court is loathe to construe any regulation in a way that would render it ineffectual.[20]  And it is no more inclined to defenestrate the FAR provisions in question – which is exactly what would happen were the court to countenance the post-award palliative offered up by defendant here.  The court cannot do this even in the name of deferring to agency discretion, as the agency has the discretion neither to ignore the FAR nor to render any of its provisions

---

[19]  *See LEADS Corp.*, 2003 CPD ¶ 197 at 3 (2003) (describing a firewall that entailed: (i) separating the relevant personnel from other of contractor's business units electronically, organizationally, and physically; (ii) requiring continuous educations programs on the topic; (iii) nondisclosure agreements; (iv) implementing document control policies; (iv) auditing the firewall's measures semi-annually; (v) continually updating the list of ongoing contact with agency); *see also Johnson Controls World Servs., Inc.*, 2001 CPD ¶ 20 at 2; *see also* Szeliga, *supra*, at 665 (noting that a firewall consists of procedures or physical security that restrict "the flow of confidential information between certain contractor business units and personnel").

[20]  *See Cammarano v. United States*, 358 U.S. 498, 505 (1959) (rejecting construction of regulation that would render a phrase "pure surplusage"); *Kauffman v. Puerto Rico Telephone Co.*, 841 F.2d 1169, 1175 (1st Cir. 1988) (declining to adopt a construction that "would render the regulation without any force or effect"); *Goldings v. United States*, 98 Fed. Cl. 470, 492 (2011); *General Elec. Co. v. United States*, 92 Fed. Cl. 798, 812 (2010); *Demutiis v. United States*, 48 Fed. Cl. 81, 89 n.10 (2000), *aff'd as modified*, 291 F.3d 1373 (Fed. Cir. 2002).

moribund.[21]  To hold otherwise would, if nothing else, run counter to the long-standing reasons for having the OCI regulations in the first place.[22]

_____

[21]  It should be noted that FAR § 9.503 allows the agency head or a designee to waive any rule or procedure in subpart 9.5 by determining that the application of such provisions "in the particular situation would not be in the Government's interest."  This section prohibits the agency head from delegating this waiver authority below the level of head of a contracting activity.  *Id.*  Notably, ICE has not invoked this procedure here.  That the FAR significantly limits how an agency may waive the OCI provisions is, in the court's view, further indication that the agency may not effectively waive those provisions by accepting a declaration from an awardee denying wrongdoing.

[22]  Detailed regulatory guidance and restrictions regarding OCIs have existed since 1963.  *See* DOD Directive 5500.10 (effective June 1, 1963), 32 C.F.R. § 141.2(b) (1966).  These rules were issued in response to a report issued by an *ad hoc* committee appointed by President Kennedy to study the impact of agencies contracting out functions.  *See* 32 C.F.R. § 1.141(a) (citing the Report to the President on Government Contracting for Research and Development, more generally known as the "Bell Report"); *see also* Pasley, *supra* at 7-8.  These initial rules focused only on research and development contracts, but nonetheless emphasized that their primary objective was to prevent government contractors from obtaining "unfair competitive advantage."  32 C.F.R. § 1.141.2(a); *see also* James W. Taylor, Organizational Conflicts of Interest in Department of Defense Contracting, 14 Pub. Cont.  L.J. 158, 159 (1983) (discussing the history of OCIs in defense acquisitions).  FAR subpart 9.5, portions of which were first adopted in 1983, *see* Fed. Reg. 42142 (1983), was designed to preserve the existing DoD policy, albeit while expanding its coverage beyond the realm of research and development contracts.  *See* Taylor and Dickson, *supra*, at 111.

Congress has also long been interested in this subject.  From 1959 through 1963, the House Committee on Government Operations issued a series of reports examining this problem, as encountered in various forms of defense contracting.  *See*, *e.g.*, House Comm. on Gov't Operations, *Avoiding Conflicts of Interest in Defense Contracting and Employment*, H.R. Rep. No. 917 (1963); House Comm. on Gov't Operations, *Air Force Ballistic Management (Formation of Aero Space Corporation)*, H.R. Rep. No. 324 (1961); House Comm. on Gov't Operations, *Organization and Management of Missile Programs*, H.R. Rep. No. 1121 (1959); *see also* Pasley, *supra* at 7, 25-26.  The 1963 report expressed concern regarding the appearance of organizational conflicts, noting that such appearances having "the same detrimental effects" as actual conflicts.  H.R. Rep. No. 917 at 2.  This report specifically noted that "[u]ndue competitive advantage, which not only causes resentment in industry but works against the Government's best interest, could be gained through . . . access to the technical know-how and trade secrets of other Government contractors."  *Id.* at 4.  It observed further that "where defense contractors get into a position potentially to exploit inside Government or industry information for their own (or a parent company's) benefit, the endeavor of Government to prevent organizational conflicts of interest has [taken the form of] curb[ing] the profitmaking propensities of the contractor by barring him from bidding on hardware contracts when he serves the Government agency as technical advisor and monitor of other contractors' production."  *Id.*

While defendant and intervenor apparently believe that these declarations, standing alone, are adequate to mitigate any conflicts here, the CO did not share that view.  Instead, she found it necessary to rely upon the rest of ALON's multi-faceted mitigation plan – including the portions that were found lacking above.  Given the shortcomings of that plan, the court will not treat these declarations as dispositive, when the CO herself did not do so.  Doing so would violate basic principles of arbitrary and capricious review under the Administrative Procedure Act.  *See SEC v. Chenery Corp.*, 332 U.S. 194, 200 (1947); *PDK Labs, Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004); *Natural Resources Defense Council, Inc. v. Herrington*, 768 F.2d 1355, 1397 n.40 (D.C. Cir. 1985) ("we may sustain the agency's decision only on the rationale it offered").  "Arbitrary and capricious review 'demands evidence of reasoned decisionmaking at the agency level,'" the D.C. Circuit has said, and "agency rationales developed for the first time during litigation do not serve as adequate substitutes."  *Williams Gas Processing-Gulf Coast Co., L.P. v. F.E.R.C.*, 475 F.3d 319, 326 (D.C. Cir. 2006).  Indeed, even if the court were inclined to rely upon the declarations, they are incomplete.  While they contain assurances from ALON's pricing team, there are no comparable assurances from other ALON employees who were involved with the preparation of other aspects of ALON's offer (*e.g.*, the technical proposal), any of whom might have benefited from second- or even third-hand knowledge of NetStar's proprietary information.[23]  Accordingly, the court concludes that the four declarations in question do not bear the considerable weight that defendant and intervenor would heap upon them.

It remains to be seen whether any mitigation plan can neutralize the potential that ALON had access to NetStar's pricing information.  The ALON plan accepted by the CO certainly did not.  It was much too little, much too late – akin to closing the stable door after the horse had bolted.  The FAR requires early identification of a potential significant OCI because it recognizes that once proprietary information has crept into the competitive process, the imbalances so created are difficult to isolate and counteract.  Unlike in Homer's Greece of old, there are no Elysian Fields here, where contractors may go to wipe from their memories information regarding their competitor's pricing information.  It thus stands to reason that the later a significant OCI is discovered, the harder an agency must work to address the harm caused thereby.[24]  This is not to say that *post hoc* remedies will always be ineffective – the decisional

---

at 5.  Similar concerns were expressed by Congress in adopting the authorization act that led to the most recent amendment of the FAR's OCI regulations.  *See* The Duncan Hunter National Defense Authorization Act for Fiscal Year 2009, Pub. L. 110-417, § 841 (codified at 41 U.S.C. § 405C).

[23]  At this point, it bears mention that a striking aspect of defendant's briefs on the cross-motions for judgment on the record is the substantial degree to which those briefs repeat arguments previously made by defendant, without addressing the deficiencies identified in this court's preliminary injunction ruling.  Suffice it to say, defendant's arguments are no more persuasive the second time around.

[24]  Indeed, some OCIs may be discovered so late in the competitive process as to preclude any form of effective mitigation.  *See* Ralph C. Nash, "Postscript:  Organizational Conflicts of Interest, 22 No. 1 Nash & Cibinic Rep. ¶ 1 (2008) ("When information has already been

law holds otherwise.[25]   But, remedies adopted after-the-fact cannot be effective if they look only forward and fail adequately to address unequal access problems that have occurred in the past. Nor can such plans be viewed as effective if they allocate to the putative contract awardee the task of policing and mitigating its own potential conflicts of interest.[26]   Against these standards, the ALON mitigation plan adopted by the CO fails abysmally, leading the court to conclude that the CO's reliance upon that plan was contrary to the FAR, and arbitrary and capricious.

### 4.        Prejudice

Seeking to dodge the specters that haunt this procurement, defendant and intervenor cite the various declarations signed by ALON's employees denying any wrongdoing as indication that there was no prejudice here.  In this regard, defendant and intervenor do not argue that NetStar's proposal had other deficiencies that render the OCI here inconsequential.  *See ARINC Eng'g*, 77 Fed. Cl. at 203.  Rather, they claim that NetStar cannot show prejudice unless it can demonstrate that the information in question was actually used by ALON in crafting its lower-priced bid.  That, in fact, is not the law.

A long line of cases holds that when a potential significant OCI is identified, prejudice stemming from that OCI is presumed, unless the evidence shows compelling evidence to the

---

disclosed to a contractor employee, mitigation of an 'unequal access to information' type of OCI may be virtually impossible."); *Szeliga*, *supra* at 664-65 ("Because it is difficult to mitigate an OCI after it has affected a procurement, most mitigation strategies focus on addressing prospective OCIs before an actual conflict arises.").

[25]   Defendant and intervenor emphasize the Federal Circuit's recent declaration in *Turner* that "[a] CO's post-award evaluation can clear the air of any OCI taint by showing that no significant OCI existed." *Turner*, 645 F.3d at 1386.  In that case, however, the CO conducted a "comprehensive investigation" into the OCI, involving interviews with the affected employees and the collection of forty-two declarations, leading to the production of a 150-page report. *Id.* at 82.  That is hardly this case.  *Turner*, of course, also warns that "[i]f, however the CO's post award evaluation shows that a significant potential OCI did exist and went unmitigated in violation of § 9.405(a)(2), then serious remedial actions are appropriate."  *Id.* at 1386.  **That** is this case, sans the serious remedial action.

[26]   *See*, *e.g.*, *B.L. Harbert-Brasfield & Gorrie, J.V.*, 2010 C.P.D. ¶ 69 at  (2010) ("an agency may not, in effect, delegate to the contractor itself complete responsibility for identifying potential organizational conflicts of interest, or mitigating them"); *McCarthy/Hunt, JV*, 2010 C.P.D. ¶ 68 at 5 (2010) ("An agency's reliance on . . . a contractor's unilateral efforts to implement a mitigation plan . . . is inconsistent with the FAR."); *L-3 Servs., Inc.*, 2009 C.P.D. ¶ 171 (unreasonable for an agency to rely on a mitigation plan that was "unevaluated by, and unmonitored by the [agency] – in a word, self executing"); *see also* Bartley, *supra*, at 540 ("Above all, an agency should not rely on the contractor's self-assessment that it has properly mitigated an OCI.").

contrary.  *See Turner*, 94 Fed. Cl. at 576; *ARINC Eng'g*, 77 Fed. Cl. at 203.[27]  One of the reasons why this is the case is "because the contracting officer must avoid and address not only actual, but apparent, conflicts of interest."  *ARINC Eng'g*, 77 Fed. Cl. at 203; *see also NKF Eng'g Inc. v. United States*, 805 F.2d 372, 375-76 (Fed. Cir. 2010) (appearance of impropriety enough to warrant disqualification; proof actual harm or prejudice is unnecessary); *Turner Const. Co.*, 94 Fed. Cl. at 576; *Ktech Corp.*, 2002 C.P.D. ¶77 at 4 (2000) (OCI present where contractor had access to confidential information of the protestor and "may have used that information to enhance its capabilities.").  Thus, a protestor need not show that the persons who drafted an offeror's proposal were actually in possession of proprietary information as a result of their employees' work for the agency, but merely must show that the information was accessible to those employees and that the potential OCI created by that access has not been avoided or adequately mitigated.[28]  Nor must " a protestor . . .  show that the information possessed by its competitor specifically benefited the latter's proposal." *ARINC Eng'g*, 77 Fed. Cl. at 203.  That too is presumed.[29]

### C.    Injunctive Relief

Having concluded that the instant procurement was legally flawed and that plaintiff was prejudiced, the court must determine whether plaintiff has made three additional showings to warrant injunctive relief, *to wit*, that:  (i) it will suffer immediate and irreparable injury; (ii) the public interest would be better served by the relief requested; and (iii) the balance of hardships on all the parties favors granting the injunction.  *Idea Intern., Inc. v. United States*, 74 Fed. Cl. 129, 141 (2006); *Bannum*, 60 Fed. Cl. 718, 730 (2004); *Seattle Sec. Servs.*, 45 Fed. Cl. at 571.

---

[27]  *See also McCarthy/Hunt, J.V.*, 2010 C.P.D. ¶ 68 ("In short once an organizational conflict of interest is established, the protester is not required to demonstrate prejudice; rather, harm from the conflict is presumed to occur."); *Lockheed Martin Corp.*, 2005 C.P.D. ¶ 24 (2005); *Marinette Marine Corp.*, 2009 C.P.D. ¶ 16 (2009); *The Jones/Hill Joint Venture*, 2001 C.P.D. ¶ 194 (2001); Feldman, *supra* at § 3:35 ("Where the record establishes an OCI, competitive prejudice to a protester as an interested party will be presumed, unless the evidence shows 'compelling' evidence to the contrary.").

[28]  *See QualMed, Inc. v. Office of Civilian Health & Medical Program of the Uniformed Services*, 934 F. Supp. 1227 (D. Colo. 1996); *VRC, Inc.*, 2007 C.P.D. ¶ 202 (2007); Ralph C. Nash, Postscript, *supra*, at ¶1 ("We agree . . . that mitigation is not a very practical remedy once a contractor's employee has obtained proprietary or source selection information.  Not even a nondisclosure agreement or a firewall will dispose of the appearance of an OCI."); Ralph C. Nash & John Cibinic, "Protests:  The 'No Prejudice' Rule," 11 No. 5 Nash & Cibinic Rep. ¶ 20 (1997); *see also Central Arkansas Maintenance, Inc. v. United States*, 68 F.3d 1338, 1343 (Fed. Cir. 1995) (discussing the prejudice required to issue an injunction in a case involving a conflict of interest).

[29]  In terms of prejudice, it should also not be overlooked that had ALON's price not been substantially lower than NetStar's, there is significant likelihood that NetStar would have obtained the BPA based upon its superior technical ranking.

No one factor is dispositive to the court's inquiry, as "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *see also Seattle Sec. Services*, 45 Fed. Cl. at 571.  In the instant case, the existence of irreparable injury to plaintiff, the balancing of harms in favor of plaintiff, and the public interest all lead this court to grant injunctive relief.

### 1.    Irreparable Injury

When assessing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction."  *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993).  Plaintiff argues that it will suffer irreparable harm if an injunction is not granted, because the only other available relief – the potential for recovery of bid preparation costs – would not compensate it for the loss of valuable business on the BPA. This type of loss, deriving from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm.  *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 52 Fed. Cl. 826, 828 (2002); *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profit has been recognized to constitute significant harm."); *Magnavox Elec. Sys. Co. v. United States*, 26 Cl. Ct. 1373, 1379 (1992) (same); *Bean Dredging Corp. v. United States*, 22 Cl. Ct. 519, 524 (1991) (bidder would be irreparably harmed because it "could recover only bid preparation costs, not lost profits, through an action at law").[30]  Accordingly, plaintiff has adequately demonstrated that it will suffer irreparable harm if injunctive relief is not provided.

### 2.    Balance of Hardships

Under this factor, "the court must consider whether the balance of hardships leans in the plaintiff's favor," requiring "a consideration of the harm to the government and to the intervening defendant."  *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715 (2006); *see also Heritage of America, LLC v. United States*, 77 Fed. Cl. 66, 79 (2007); *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003).  Remarkably, defendant has identified no hardships – not even minor ones – that it will experience if the award to ALON is set aside.  The court must assume that defendant has alternatives for obtaining the services that are the subject of the procurement in question during the time that it will be necessary to reprocure those services.  On the flip side, there is little doubt that plaintiff would be harmed if the award in question was allowed to proceed.  Here, then the scales thus dip heavily in plaintiff's favor.

At this point, a further word is warranted on the nature of relief.  Plaintiff urges the court to exclude ALON from any reprocurement.  The court, however, is unprepared to go that far.  It

---

[30]  Support also exists for the proposition that the denial of the right to have a bid fairly and lawfully considered constitutes irreparable harm.  *See Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 398 (1999) (citing cases); *but see Minor Metals, Inc. v. United States*, 38 Fed. Cl. 379, 381-82 (1997) (noting "economic harm without more, does not seem to rise to the level of irreparable injury").

would seem that a preliminary step here is for the contracting officer to develop and examine the facts to determine whether the OCI identified here may be mitigated.  *See Jacobs Tech.*, 2011 WL 3555595 at * 10.  In the court's view, this requires the CO, at a minimum, to set aside the award decision here, as well as the proposals submitted in response to the RFQ, and to determine whether the adoption of a new mitigation plan may pave the way for the submission of new proposals unaffected by any unequal access claim.  *See, e.g.*, *Johnson Controls World Servs., Inc.*, 2001 C.P.D. ¶ 145 (2001) (mitigation of OCI accomplished by providing all offerors with access to database of nonpublic information and by making available agency personnel to assist offerors in understanding and interpreting the contents of the database); *see also GIC Agric. Group*, 92-2 C.P.D. ¶ 263 (1992); Szeliga, *supra*, at 666.  Should that prove impossible, the CO may be forced either to issue a new RFQ or, perhaps, to exclude ALON from a new competition.  The latter decisions may be dictated by the FAR, which, as discussed above, prohibits the award of a contract impacted by a potential significant OCI that is unmitigated (or not waived).

### D.      Public Interest

Plaintiff also contends that the public interest will be served by granting the requested preliminary injunctive relief.  "Clearly, the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid."  *PGBA*, 57 Fed. Cl. at 663; *see also Rotech Healthcare, Inc. v. United States*, 71 Fed. Cl. 393, 430 (2006); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997); *Magellan Corp.*, 27 Fed. Cl. at 448.  In the present case, the public's interest likewise lies in preserving the integrity of the competitive process.

## III.    CONCLUSION

The court finds that the prerequisites for issuing an injunction have been fully satisfied here.  In consideration of the above:

1.      Plaintiff's motion for judgment on the administrative record is **GRANTED** and defendant's and intervenor's cross-motions for judgment on the administrative record are **DENIED.**

2.      Defendant, acting by and through the Department of Homeland Security (and any agency thereof), as well as ALON Corp., are hereby **ENJOINED** from performing on contract RFQ HSCEMS-IO-Q-00015.  Said parties also must suspend any related activities that may result in additional obligations being incurred by the United States under this contract.

3.      Defendant, acting by and through the Department of Homeland Security is hereby **ENJOINED** from relying upon, as the basis for any future award, any of the proposals submitted by the offerors in response to RFQ HSCEMS-IO-Q-00015.

4.      Nothing herein shall be deemed to prevent defendant and plaintiff from

mutually agreeing to resolve this matter in such fashion as they deem appropriate.

5.     This opinion shall be published as issued on October 14, 2011, unless the parties identify protected and/or privileged materials subject to redaction prior to said time and date. Said materials shall be identified with specificity, both in terms of the language to be redacted and the reasons for that redaction (including appropriate citations to authority).

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

**<u>Netstar-1 Government Consulting, Inc. v. United States, Doc. No. 11-294C</u>**

**Acronyms**

| | |
|---|---|
| BEP | Budget execution plan |
| BPA | Blanket purchase agreement |
| CO | Contracting Officer |
| COTR | Contracting Office Technical Representative |
| DHS | Department of Homeland Security |
| DOD | Department of Defense |
| FAR | Federal Acquisition Regulations |
| FSS | Federal Supply Service |
| GAO | General Accountability Office |
| HSAR | Homeland Security Acquisition Regulation |
| ICE | Department of Homeland Security, United States Immigration and Customs Enforcement |
| OCI | Organizational conflict of interest |
| OCIO | Department of Homeland Security, ICE Office of the Chief Information Officer |
| RFQ | Request for quotation |
| SOW | Statement of work |